UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WAUSAU UNDERWRITERS INSURANCE
COMPANY a/s/o HOSPITALITY WEST, LLC,

                Plaintiff,

v.

THE OSBORNE TRANSFORMER CORPORATION
and CHECK CORPORATION,

                Defendants.
_____

**REPORT AND RECOMMENDATION**

11-CV-00819(A)(M)

        This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings [14].[1] Before me are the motions of defendants The Osborne Transformer Corporation ("Osborne") [28] and Check Corporation ("Check") [38] to dismiss the Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. ("Rule") 12(b)(2). Osborne also moves to dismiss Check's cross-claim for lack of personal jurisdiction. Amended Notice of Motion [29]. Oral argument was held on February 27, 2013 [43]. For the following reasons, I recommend that the motions be denied, without prejudice.

**BACKGROUND**

        This case arises from a November 23, 2008 fire at a Pizza Hut restaurant owned by plaintiff Hospitality West, LLC ("Hospitality West") located at 610 North Union Street in Olean, New York. Complaint [1], ¶¶14-16. It is alleged that the fire and resulting damage was caused by a power distribution unit ("PDU") manufactured by Osborne and sold and/or distributed to Hospitality West by Check. Id., ¶17.

---

[1]     Bracketed references are to the CM/ECF docket entries.

Pursuant to the terms of its policy, plaintiff Wausau Underwriters Insurance Company ("Wausau") paid Hopitality West $702,759.04 for the damage sustained. Id., ¶¶21-22. Wausau, as Hospitality West's subrogee, commenced this action against Osborne and Check asserting various negligence and products liability claims.

**ANALYSIS**

"In resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process". Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F. 3d 560, 567 (2d Cir. 1996), cert. denied, 519 U.S. 1006 (1996).

"Plaintiff bears the burden of establishing personal jurisdiction, but that burden is fairly light this early in the case." Steuben Foods, Inc. v. Shibuya Hoppmann Corp., 2011 WL 3608064, *4 (W.D.N.Y. 2011) (Arcara, J.) "A plaintiff facing a [Rule] 12(b)(2) motion to dismiss made before any discovery need only allege facts constituting a prima facie showing of personal jurisdiction." PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 - 109 (2d Cir. 1997). The court must "construe the pleadings and affidavits in plaintiff's favor at this early stage." Id.[2]

---

[2] Although Osborne cites to Shipping Financial Services Corporation v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) for the proposition that inferences are not drawn in favor of the plaintiff, that case addressed subject matter jurisdiction, rather than personal jurisdiction. Osborne's Reply Memorandum of Law [37], p. 2.

"In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." Id.

**A.     Check's Motion to Dismiss the Complaint**

In support of its motion, Check relies on the Amended Declaration of its Controller, Kevin Buck [40-2],[3] who states that Check, which is located in Troy, Michigan, does not regularly conduct business in New York and has never had any employees actively soliciting business in New York. Id., ¶¶3, 5, 11. Of its $25,185,040 in gross revenues from 2007 to 2011, $417,225 (or approximately 1.7%) was gained from the sales of products shipped into New York. Id., ¶27.

Buck concedes that Check did sell Hospitality West heated pizza delivery bags, some of which were sold "as a package with PDUs which were manufactured by Osborne." Id., ¶20. However, he states that all sales with Hospitality West were negotiated and executed in

---

[3] In support of its motion, Check submitted an initial Declaration from Buck [38-5] that did not contain the jurat required by 28 U.S.C. §1746. It submitted an Amended Declaration [40-2] from Buck in its reply, which corrected this deficiency, but is otherwise substantively identical to his initial Declaration.

Michigan, that Check did not collect New York State sales tax on any of its sales to Hospitality West, that Hospitality West was responsible for the shipping of all of the products it purchased from Check, and that the shipping, which was handled "f.ob. Troy Michigan via common carrier", was paid for by Hospitality West separately from the purchase price of the goods. Id., ¶¶21-24. Check denies that the PDU which allegedly caused the fire "was sold, distributed or otherwise introduced into the stream of commerce by Check." Id., ¶26.

In opposition to Check's motion, Wausau relies primarily on the Declaration of Walter Ruta, Hospitality West's Director of Operations [39-8]. Ruta states that Hospitality West owns and operates approximately 24 Pizza Hut franchises, all of which are located in New York. Id., ¶4. According to Ruta, in or around January 2004, Hospitality West began to utilize "Hotbags" supplied by Check in connection with its operation of Pizza Hut restaurants, and continued to do so until approximately November 22, 2010. Id., ¶¶7, 8. During this time frame, 23 purchases of Hotbags from Check were made by Hospitality West's Pizza Hut restaurants. Id., ¶9. These orders were placed by the individual Pizza Huts directly with Check and "Check would deliver the Hotbags directly to the Pizza Hut location", while the invoices were sent to and processed by Hospitality West's administrative offices in Traverse City, Michigan. Id., ¶10. Ruta's Declaration attaches copies of the referenced invoices [39-9].

1. **New York's Long-Arm Statute**

New York's long-arm statute permits the exercise of personal jurisdiction over a non-resident defendant under general jurisdiction pursuant to New York Civil Practice Rule ("CPLR") 301, or under specific jurisdiction pursuant to CPLR 302. Wausau opposes Check's

motion, arguing that it has made a *prima facie* showing of personal jurisdiction under CPLR 302(a)(1) and 302(a)(3)(ii). Wausau's Memorandum of Law [39-10], Points II and III.

CPLR 302(a)(3)(ii) provides for the exercise of long-arm jurisdiction over a non-domiciliary, who

> "in person or through an agent" . . . commits a tortious act without the state causing injury to person or property within the state . . . if he . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce".

"In order to establish jurisdiction under [CPLR 302(a)(3)(ii)], a plaintiff is . . . required to demonstrate that (1) the defendant's tortious act was committed outside New York, (2) the cause of action arose from that act, (3) the tortious act caused an injury to a person or property in New York, (4) the defendant expected or should reasonably have expected that his or her action would have consequences in New York, and (5) the defendant derives substantial revenue from interstate or international commerce." Penguin Group (USA) Inc. v. American Buddha, 609 F.3d 30, 35 (2d Cir. 2010) (*citing* LaMarca v. Pak-Mor Manufacturing Co., 95 N.Y.2d 210, 214 (2000)).

Check concedes that, for purposes of this motion, the only element in dispute is whether it expected or should reasonably have expected that its acts would have consequences in the state. Check's Memorandum of Law [38-6], p. 15.[4] "'The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one.'" Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 241 (2d Cir. 1999) (*quoting*

---

[4] Wausau argues that since Check does not dispute that it committed a tortious act causing injury in the state, that it has admitted liability, and a damages inquest should be scheduled. Wausau's Memorandum of Law [39-10], Point VI. I disagree. Check's concessions were clearly only for purposes of this motion (Check's Memorandum of Law [38-6], p. 15) as it contests that its PDU caused the fire. Amended Buck Declaration [40-2], ¶26.

Allen v. Auto Specialties Manufacturing Co., 45 A.D.2d 331 (3d Dep't 1974)). "[F]oreseeability must be coupled with evidence of a purposeful New York affiliation, for example, a discernible effort to directly or indirectly serve the New York market.'" Id. (*quoting* Schaadt v. T.W. Kutter, Inc., 169 A.D.2d 969 (3d Dep't 1991)).

In my view, it was reasonable for Check to expect that its conduct would have consequences in New York, since over the course of approximately six years it accepted orders originating from Pizza Hut franchises in New York and supplied products to those stores. *See* Griffith v. Glock, Inc., 2005 WL 1796520, *2 (N.D.N.Y. 2005) ("RBCD directly ships ammunition to customers in New York. By directly shipping ammunition to New Yorkers, RBCD should reasonable expect its acts to have consequences in New York"). Although Check argues that Hospitality West was responsible for shipping all of the products it purchased (Amended Buck Declaration [40-2], ¶23), this is disputed by Ruta, who states that "Check would deliver the Hotbags directly to the Pizza Hut location in New York". Ruta Declaration [39-8], ¶10. At this stage, this ambiguity must be resolved in Wausau's favor.

Check also argues that "[s]ince plaintiff has failed to present any evidence to support how or when the PDU in question got into New York, plaintiff has failed to present *prima facie* evidence that Check should have reasonably foreseen that this unidentified act would have consequences in New York." Check's Reply Memorandum of Law [40], p. 6. I disagree. The issue of whether Check supplied the subject Pizza Hut with a PDU manufactured by Osborne remains in dispute. At oral argument, Check's counsel conceded that the fire destroyed any ability to identify the unit. While Check points to the absence of any invoice establishing the shipment of a PDU by Check to the Olean Pizza Hut, Wausau's counsel countered at oral argument that the

invoices attached to the Ruta Declaration may not be the entirety of the documentary evidence in this case.

Even without an invoice establishing that a PDU was shipped by Check to the subject Pizza Hunt, Wausau submits the Declaration of Wayne Baldwin, an employee of Vesture Corporation, a manufacturer of PDUs, who examined the PDU and other products at issue, and concluded that "they appear to have been manufactured and/or sold and distributed by Check Corporation". Baldwin Declaration [39-7], ¶7. The invoices attached to the Ruta Declaration also demonstrate that PDUs were supplied by Check to other Pizza Hut stores in New York (*see, e.g.*, [39-9], p. 7 of 23 (identifying the shipment of one "Power Distribution Unit, 12 Position" to the Corning, New York store)).

Coupled with supplying Hospitality West's New York Pizza Hut restaurants with its products, Wausau avers that Check maintains "a highly interactive website at www.checkcorp.com, though which any individual throughout the United States may purchase any one of Check's various products, including Hotbags" with PDUs. Wausau's Memorandum of Law [39-10], pp. 3, 11. "Generally, an interactive website supports a finding of personal jurisdiction over the defendant." Hsin Ten Enterprise USA, Inc. v. Clark Enterprises, 138 F.Supp.2d 449, 456 (S.D.N.Y. 2000). *See* Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Organization, LLC, 875 F.Supp.2d 211, 222 (W.D.N.Y. 2012) (Larimer, J.). Check does not dispute that the existence of an interactive website can be a factor weighing in favor of personal jurisdiction. Instead, it argues that its "website as it exists in 2013 is irrelevant". Check's Reply Memorandum of Law [40], p. 6. However, this too is an ambiguity that must be resolved in Wausau's favor for purposes of this motion.

These facts, at minimum, also evidence an effort to indirectly serve the New York market. Therefore, I conclude that Wausau has, at this stage, carried its *prima facie* burden of demonstrating long-arm jurisdiction over Check pursuant to CPLR 302(a)(3)(ii).[5]

2.  **Due Process**

I must next determine whether the exercise of New York's long-arm jurisdiction comports with Due Process. "The constitutional analysis under the Due Process Clause consists of two separate components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry. The 'minimum contacts' inquiry requires us to consider whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 (2d Cir. 2012). Here, Check appears to only challenge the minimum contacts requirement.

Wausau responds that "because this Court has personal jurisdiction over Check under the provisions of NY CPLR §302(a)(3)(ii) . . . no constitutional concerns are implicated by this exercise of jurisdiction." Wausau's Memorandum of Law [39-10], p. 13. It relies on Ingraham v. Carroll, 90 N.Y.2d 592, 596-97 (1997), which noted "that establishment of long-arm jurisdiction in connection with a New York injury under either [CPLR 302(a)(3)(i) or (ii)] does not implicate constitutional due process concerns. . . . [This subdivision] was not designed to go to the full limits of permissible jurisdiction. The limitations contained in subparagraphs (i) and (ii) were deliberately inserted to keep the provision 'well within constitutional bounds'". However, this portion of the decision was *dicta*. See LaMarca, 95 N.Y.2d at 216 ("Because CPLR

---

[5] Having concluded that jurisdiction exists under CPLR 302(a)(3)(ii), I need not determine whether it also exists under CPLR 302(a)(1).

302(a)(3)(ii) did not authorize jurisdiction over the defendant in Ingraham . . . we had no need to consider Federal due process"); Steuben Foods, Inc. v. Morris, 2002 WL 1628061, *3 n. 14 (W.D.N.Y. 2002) (Arcara, J.) (citing to this aspect of Ingraham, but proceeding to analyze whether personal jurisdiction comported with Due Process).

"Where, as here, the claim arises out of, or relates to, the defendant's contacts with the forum . . . . the required minimum contacts exist where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 152 (2d Cir. 2001) (*quoting* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).

For the reasons discussed above, it appears that Check purposefully availed itself of the privilege of doing business in New York and should have for foreseen the possibility of being haled into court here by accepting and filling orders placed by Pizza Huts franchises located in New York for products to be used in those stores over an approximately six-year period.

At this early stage of the case, I conclude that Wausau has made a *prima facie* showing of personal jurisdiction. Therefore, I recommend that Check's motion be denied, without prejudice to renewal upon further factual developments through discovery.

**B.   Osborne's Motion to Dismiss the Complaint**

Osborne concedes that it "falls within the reach of New York's long-arm statute by virtue of CPLR 302(a)(3)(iii) [*sic*]", but disputes whether its contacts are sufficient to comport

with the Due Process Clause of the Fourteenth Amendment. Osborne's Memorandum of Law [28-8], p. 18.

In support of its motion, Osborne relies on the Declaration [28-6] of its President, James Osborne, who states that "[f]rom January 1, 2000 through December 31, 2011, [Osborne] has made a total of 4,319 shipments of its products", 37 of which (or .86%) were sent to entities in New York. Id., ¶7. During this same time period it "derived $15,705,274.70 in revenue" from these shipments of which $53,504.58 (or .34%) was derived from shipments to New York. Id., ¶8. According to Osborne, "[o]ther than purchase orders for the aforementioned sales, [it] has no contracts to supply goods or services in New York State on a continual basis." Id., ¶9.

Attempting to distance itself from any contacts which Check may have had with New York, Osborne contends that "[t]he PDUs were designed and manufactured in Michigan and shipped to Check . . . in Michigan pursuant to purchase orders" (id., ¶10) and that Osborne "has no control as to the entities to whom [Check] sells and ships the PDUs". Id., ¶11. Although Check would "[o]ccasionally" request that Osborne send repaired PDUs to its customers, none of these shipments were made to New York, and this was done at the request and direction of Check. Id., ¶12. Osborne's Declaration attaches a list of the shipments of repaired PDUs it made to Check's customers between May 1998 to January 1999 [28-7]. Each of the 28 shipments were made to various Pizza Huts. Id. He also states that Osborne:

- did not sell or ship PDUs to customers in New York State Id, ¶10.

- "has never targeted potential customers in New York through an advertising campaign" Id., ¶18.

- "has never sent employees to the State of New York for any purpose, whether it be for business solicitation or any other purpose" Id., ¶19.

- "does not employ any individuals in the State of New York" Id., ¶20

- maintains a website that "does not allow for the placement of orders or purchases" Id., ¶20.

- "does not, in any way, target customers in New York" Id., ¶21.

In its reply, Osborne submits a Second Declaration from James Osborne [37-1] which denies that Check was Osborne's distributor or that they had an agency agreement. Id., ¶¶5, 8.

Osborne appears to only challenge the minimum contacts requirement of the Due Process clause. Osborne's Memorandum of Law [28-8], pp. 18-24. In opposing Osborne's motion, Wausau argues that at this pre-discovery stage, it "lacks access to information and documents that could conclusively establish Osborne's contacts with New York." Wausau's Memorandum of Law [33], p. 3. Alternatively, it seeks an evidentiary hearing or limited discovery on the issue of whether personal jurisdiction exists over Osborne. Wausau's Memorandum of Law [33], Point III.

"[W]hen a plaintiff opposing a motion to dismiss contends that discovery on the issue of personal jurisdiction is necessary, the plaintiff need not make a *prima facie* showing of jurisdiction, but at the very least must make a sufficient start toward establishing jurisdiction by showing its position to be non-frivolous. To obtain jurisdictional discovery, the plaintiff need only demonstrate that facts may exist to exercise personal jurisdiction over the defendant. However, the court is within its discretion to deny jurisdictional discovery when little more exists than plaintiff's bare assertions that jurisdiction is proper." Zoological Society of Buffalo, Inc. v. CarvedRock, LLC, 2011 WL 6329929, *3 (W.D.N.Y.) (Schroeder, M.J.), adopted, 2011 WL 6329872 (W.D.N.Y. 2011) (Arcara, J.) (internal citations and quotations omitted).

-11-

Without the benefit of jurisdictional discovery, Wausau relies primarily on the allegations of the Complaint, which it argues I must accept as true for purposes of this motion. Wausau's Memorandum of Law [33], p. 8. The Complaint [1] contains allegations relevant to personal jurisdiction, including that Osborne:

- "regularly did and/or solicited business and/or engaged in a persistent course of conduct and/or derived substantial revenue from the manufacture, design and/or sale of PDUs in New York". Id., ¶8.

- "derived substantial revenue from interstate and/or international commerce and expected, or should reasonably have expected, in the stream of commerce [*sic*]." Id., ¶9.

- "designed, manufactured and/or sold the PDU to the Insured pursuant to a contractual relationship with . . . Check." Id., ¶68.

In adjudicating a pre-discovery motion to dismiss pursuant to Rule 12(b)(2), "[t]he allegations in the complaint must be taken as true *to the extent they are uncontroverted by the defendant's affidavits*." Seetransport Wiking Trader Schiffarhtsgellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993) (emphasis added). *See* MacDermid, Inc. v. Deiter, 702 F.3d 725, 727 (2d Cir. 2012) (same); Peterson v. Islamic Republic of Iran, 2013 WL 2246790, *5 (S.D.N.Y. 2013); Steuben Foods, Inc. v. Shibuya Hoppmann Corp., 2011 WL 3608064, *4 (W.D.N.Y. 2011) (Arcara, J.) ("In the procedural posture of a motion to dismiss, a district court must accept the *uncontroverted* allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor" *quoting* Electronics For Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed.Cir. 2003) (emphasis added)).

The Osborne Declaration does not controvert the entirety of Wausau's jurisdictional allegations. Indeed, as Wausau argues, the Osborne Declaration demonstrates that

-12-

Osborne was aware that its PDUs were being distributed to Pizza Hut locations nationwide by Check [28-7]. Based upon this, Wausau argues that "[i]t is reasonable to infer that . . . Osborne not only hoped or expected, but in fact knew that its product would be sold to customers throughout the United States, including New York." Wausau's Memorandum of Law [33], p. 12. Osborne responds that this theory of minimum contacts based upon a "stream of commerce" analysis was "abrogated by the plurality opinion in [J. McIntyre Machinery, Ltd. v. Nicastro, __U.S. __, 131 S.Ct. 2780 (2011)]". Osborne's Reply Memorandum of Law [37], p. 9. I disagree.

The stream of commerce theory, as originally articulated by the Supreme Court, recognizes that:

> "when a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' . . . it has clear notice that it is subject to suit there . . . . Hence if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297-98 (1980).

However, in Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 112 (1987), Justice O'Connor, joined by three other justices, heightened this standard by concluding that "minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State* . . . . The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State"

(emphasis in original). Recently, in McIntyre, another plurality, led by Justice Kennedy, adopted this heightened standard, concluding that:

> "[t]he principal inquiry [under the stream of commerce analysis] is whether the defendant's activities manifest an intention to submit to the power of a sovereign . . . .The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." McIntyre, 131 S.Ct. at 2788.

Moreover, Justice Breyer's concurrence (joined by Justice Alito) declined to depart from the court's prior precedent on the stream of commerce theory. *See* id. at 2791 ("I think it unwise to announce a rule of broad applicability without full consideration of the modern-day consequences. In my view, the outcome of this case is determined by our precedents"). Instead, he concluded that the activities in McIntyre failed to establish personal jurisdiction under either articulation of the stream of commerce standard. Id. at 2792 ("None of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient").

Although Osborne cites to cases holding that the plurality decision in McIntyre is controlling (Osborne's Reply Memorandum of Law [37], p. 8, n. 4), I agree with those cases holding that "because no opinion in *J. McIntyre* commanded five votes, Justice Breyer's concurrence controls." UTC Fire & Security Americas Corp., Inc. v. NCS Power, Inc., 844 F.Supp.2d 366, 376 (S.D.N.Y. 2012). *See* AFTG-TG, LLC v. Nuvoton Technology Corp., 689 F.3d 1358, 1363 (Fed. Cir. 2012) ("Because *McIntyre* did not produce a majority opinion, we must follow the narrowest holding among the plurality opinions in that case . . . . The narrowest holding is that which can be distilled from Justice Breyer's concurrence-that the law remains the same after *McIntyre*").

Furthermore, as noted by Wausau, Osborne fails to identify its relationship with Check, including whether they had an agency agreement, and whether it uses other distributors/agents to distribute its products and whether those entities target the New York market. Wausau's Memorandum of Law [33], p. 9. This is a significant issue. *See* UTC Fire & Security Americas Corp., 844 F.Supp.2d at 376-77 (finding that personal jurisdiction existed over a Chinese battery manufacturer in a products liability action based on its agency agreement with a sales representative that solicited business in New York).

Osborne belatedly attempts to remedy this deficiency through the Second Osborne Declaration [37-1], which it submitted as part of its reply. Even if it had been initially submitted with Osborne's motion, while unequivocally disavowing the existence of an agency or distributorship agreement between Check and Osborne ([37-1], ¶¶5, 8), Osborne only represents "*[u]pon information and belief*" that Osborne did not use any other "distributors or agents who targeted New York markets with its products". Second Osborne Declaration. Id., ¶11 (emphasis added). Moreover, whereas Osborne states that it never targeted customers in New York, it offers no explanation as to where or how it derived the 37 shipments of products it made into New York from 2000 to 2011. *See* Wausau's Memorandum of Law [33], p. 9.

Although this is a close call, resolving all ambiguities in Wausau's favor and recognizing that its burden at this stage is only to make a *prima facie* showing of personal jurisdiction, I conclude that Wausau has established that the exercise of personal jurisdiction over Osborne comports with Due Process.

Notwithstanding my conclusion that Wausau has met its minimal *prima facie* burden at this stage, given the representations contained in the Osborne Declarations, I am

concerned with whether it can ultimately prevail on this issue. Osborne acknowledges that in the event that an outright dismissal is not granted, it "does not object to brief discovery on jurisdictional issues and/or an evidentiary hearing." Osborne's Reply Memorandum of Law [37], p. 9.

Therefore, I recommend that Osborne's motion to dismiss for lack of personal jurisdiction be denied, without prejudice to refiling after the completion of abbreviated and limited jurisdictional discovery. At that time, the issue may also be ripe for an evidentiary hearing. *See* Jones v. Warren, 2013 WL 3439969, *1 (E.D.N.Y. 2013) ("If [the plaintiff] succeeds [on its *prima facie* showing of personal jurisdiction], the Court may order jurisdictional discovery and, depending on the facts adduced, conduct an evidentiary hearing at which the plaintiff must establish jurisdiction by a preponderance of the evidence").

**C.     Osborne's Motion to Dismiss Check's Cross-Claim**

Although Osborne moves for this relief, it makes [29] no specific arguments in this regard. Therefore, I recommend denying Osborne's motion to dismiss Check's cross-claims.

**CONCLUSION**

For these reasons, I recommend that Osborne and Check's motions [28, 29, 38] to dismiss be denied, without prejudice. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by October 4, 2013 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to

concerned with whether it can ultimately prevail on this issue. Osborne acknowledges that in the event that an outright dismissal is not granted, it "does not object to brief discovery on jurisdictional issues and/or an evidentiary hearing." Osborne's Reply Memorandum of Law [37], p. 9.

Therefore, I recommend that Osborne's motion to dismiss for lack of personal jurisdiction be denied, without prejudice to refiling after the completion of abbreviated and limited jurisdictional discovery. At that time, the issue may also be ripe for an evidentiary hearing. *See* Jones v. Warren, 2013 WL 3439969, *1 (E.D.N.Y. 2013) ("If [the plaintiff] succeeds [on its *prima facie* showing of personal jurisdiction], the Court may order jurisdictional discovery and, depending on the facts adduced, conduct an evidentiary hearing at which the plaintiff must establish jurisdiction by a preponderance of the evidence").

**C.     Osborne's Motion to Dismiss Check's Cross-Claim**

Although Osborne moves for this relief, it makes [29] no specific arguments in this regard. Therefore, I recommend denying Osborne's motion to dismiss Check's cross-claims.

**CONCLUSION**

For these reasons, I recommend that Osborne and Check's motions [28, 29, 38] to dismiss be denied, without prejudice. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by October 4, 2013 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to

object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.


Dated: September 17, 2013

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge